Good morning, Your Honors. May it please the Court, Michelle Roberts on behalf of Plaintiff Appellant Mobayen. Good morning, Counsel. How come all these excerpts of record are under seal? Is there some secret here? There was an agreement with the parties regarding the nature of the confidential documents, including the Standards Claims Manual that was produced. We agreed to submit it under seal. Are we allowed to talk about it in our disposition? I don't think so. Yeah, there's no. Okay. I'd like to focus this argument on the merits of the claim because I think that they're really compelling. Her claim was simple. I'm sorry, Counsel. That does raise a question, though. Didn't Judge Reel grant the evidentiary objection to consideration, for example, of the claims manual itself as being outside the administrative record? Yes, he did, Your Honor. At the bench trial, he was only aware that the defendants had filed two motions to strike the evidence. And at the time, His Honor was only aware of one motion to strike, and he granted it. But the motion was to strike the claims manual, the Corvell Declaration, and there was a third thing, was there not? That's right. There was a declaration submitted by the plaintiff regarding her work history, but it wasn't really necessarily relevant. And apparently the District Court bought the argument that those were irrelevant to the conflict that standard was under but dealt more with the merits of her claim. That's right. The court refused to consider that evidence because it said it was outside of the administrative record. Okay, but given that court's ruling, I noticed in your brief that you don't try to differentiate between the evidence that the court excluded and the evidence that you want to bring to our attention. So I guess my question for you is, in light of our general rule that we only consider the evidence that was contained within the administrative record, how do I go through your brief and sort of parse out those arguments that were based on evidence that was admitted and those arguments that are based on evidence that was excluded? Your Honor, I think that the District Court erred by excluding that information. As the court stated in Abatey, it should consider evidence or it may consider evidence outside of the administrative record. If it relates to the conflict. That's right. And I do believe it relates to the conflict. So the question we have to decide is whether or not the court abused its discretion in ruling that it was not relevant. That's right. But the question I have for you really is more of a, you know, how you've essentially crafted an argument based on evidence that was admitted and evidence that was excluded, but I can't tell which is which from the argument. Right. You know, the evidence that was excluded included, like you said, the Corvell Declaration, the deposition transcript of Anthony Woodward, Dr. Anthony Woodward, the declaration submitted by the plaintiff, and the plaintiff also submitted EMG test results that were attained a few months after standard rendered its final determination. And we believe that under Stefan that this court should consider that evidence because standard in its final determination changed the basis of its reasoning for denying her claim. But we don't reuse the merits decision de novo, do we? No, you don't. If we decide that Judge Real abused his discretion in excluding the evidence, we reverse and remand and tell him you've got to reconsider, you've got to retry this case, and this time you've got to consider that. Right. Your Honor, I think that even if you choose to not consider this evidence that was outside of the administrative record, the evidence in the administrative record supports. All right. Well, why don't we start? Let's hear the argument. There's something about that. I frankly had difficulty seeing why it mattered whether Judge Real was right or wrong to exclude the evidence. It's ERISA. It's not Social Security. So under Jordan, there's no special deference for a treating physician. That's right, and we're not arguing that. There's conflicting evidence. Her activities are not very limited. There's a lot of medical evidence that she's really not disabled at all, or certainly not significantly disabled. There's also evidence that she is. You've got a claims administrator, and let's assume they do have a conflict of interest, so the scrutiny is more intense. Still, they have discretion under the policy, and I can't see why they couldn't exercise their discretion to reach the result they did. When I look at all these electromyogram and MRI results that are negative, and her activities, which indicate that she's just not in that bad shape. Your Honor, the decision that Standard made in the beginning of her claim, they found that she was disabled as a result of what it called mechanical neck and back pain. So Standard accepted her disability, and it called her neck and back pain mechanical because there was no evidence of radiculopathy or myelopathy. Now, under the terms of the plan. Well, that's the heart of it, at least from my perspective. What is the causation? They do find some evidence of radiculopathy. It's clear fiber, I forget how you pronounce it, but clearly has that, but that's only good for 18 months. What's the evidence? Summarize for me that radiculopathy is a cause of her ongoing pain. Sure. Radiculopathy. Well, let's look at what's radiculopathy. All that is is it means that the pain radiates down your buttocks. All it is is a symptom, and it measures how much the disc is pressing on the nerve. Right. So radiculopathy. And her discs don't look bad, and her MRI is an electromyogram. Your Honor, I disagree. Well, there's two issues here. We have the lumbar radiculopathy issue, and then there's the cervical radiculopathy. And radiculopathy means a disruption or, I'm sorry, a damage to your nerve function. Happy means sickness, and radiculo means radiating. Right. It means there's something wrong as the nerves radiate down. Exactly. So it includes or it causes particular pain. Typically compression from the disc. Right. Includes numbness, loss of coordination, weakness, loss of sensation. And if you look at her medical records, there's ample examples of her doctors documenting decreased sensation. Yeah, but it doesn't mean you're disabled when you have that. A lot of us have the same thing. It's no big deal if it hurts somebody. Right. Your Honor, but you have to look at Standard's decision. And Standard determined she was disabled as a result of these symptoms that were related to the radiculopathy, but for which they did not have an EMG. And then once Ms. Mobayen provided the EMG, and they could no longer say she did not have radiculopathy. Look, here's what happened. She had symptoms that looked like they'd be consistent either with her discs compressing her nerves or a lot of pain reports that would be better explained by fibromyalgia because they can't see the orthopedic problem when they look at the MRI and the electromyogram. And they did the MRI and electromyogram, and they can't see it, so they say it must be fibromyalgia. Your Honor, no one can see pain on an EMG. You can see some causes of it. Sure, and that's why the EMG said there's probable radiculopathy. They don't say she's lying about her pain. They just say it must not have an orthopedic cause, which is just what Judge Trager was talking about. Your Honor, her doctors, she was evaluated by several doctors. They all documented that she was having, Dr. Yee and Dr. Abizari said that she had symptoms of radiculopathy. So they acknowledged that her pain was not attributable to the fibromyalgia, which is a condition that she did have, but that she had the radicular pain in her shoulders and her arms. She had loss of coordination. Those things aren't caused by fibromyalgia. That's related to the radiculopathy. Isn't that what the doctor said? Which doctor? Radiculopathy is not a separate disease. When you've got, you go to the doctor and you say, my fingers are numb, and the bottom two fingers, they stick together. They don't separate. When I try to separate my fingers, the doctor says, hmm, sounds like a disc in your neck. Let's get an MRI of your neck, maybe an electromyogram. And they do it. Gee, it came out negative. It must not be the disc in your neck. It must be something else. I can't find anything else. It must be fibromyalgia. Your Honor, in this case, there was an EMG that showed that there was radiculopathy, and there was root irritation at C6 and C7 of her vertebrae. So there was, I mean, the EMG supported that she was having problems with the nerve root compression in her back. EMG that he excluded? No, it's not, Your Honor. I'm talking about the EMG that they submitted before they made the final, before Standard made the final determination. And the report said probable radiculopathy. It requested a clinical correlation. And so Standard accepted that as proving radiculopathy, or at least they said they could not exclude this disability because they believed that there was evidence of radiculopathy. Instead, what they did is they cherry-picked Dr. Woodward's report, and Dr. Woodward said there is no radiculopathy because there are no consistent neurological abnormalities. And Standard rejected that. They said, no, okay, you do have radiculopathy, but we're going to say because there are no consistent neurological abnormalities, that you are not disabled to the severity that would preclude you from working full-time. Well, that's contrary to its previous position, Your Honor. Well, they're saying, or they're just saying that it was not caused by the orthopedic aspect. No, they said that there were no consistent neurological abnormalities, so that as a result she could work. They acknowledged that she had the radiculopathy. But they had previously determined that the pain that she was experiencing, which her doctors were attributing to radiculopathy, wasn't radiculopathy because there was no EMG. So they told her, you need an EMG. And, you know, Bootman, you have to have good communications. You're not getting what the words mean. I'm sorry? You don't attribute pain to radiculopathy. You attribute radiculopathy to either a disc or to something else. Radiculopathy is the symptom. Right. Well, my understanding, Your Honor, is that radiculopathy, signs of radiculopathy include radicular pain and numbness and sensory loss and loss of coordination. Aren't you saying the same thing that Judge Kleinfeld just said? You're describing a symptom, not a cause. Right. And maybe I don't understand the question, Your Honor. That's all right. I think that's what the problem is. Maybe you should move on from that. So I want to – actually, can I reserve the rest of my time for rebuttal? Thank you. Good morning. May it please the Court, I am James Monk representing the defendants and the appellees in this case. I think the Court has it right when we talk about the issue of radiculopathy and the causes of radiculopathy. But let me, just so the timeframe is clear, let me walk through that quickly. What Standard did do was ask for an EMG that demonstrated the causes of radiculopathy as their policy language dictates. The plaintiff, the insured, submitted one which said right C6, C7, root irritation with probable radiculopathy. And then their own physician said clinical correlation suggested. Clinical correlation, as the Court mentioned earlier, just means we see the problem. Let me see if it relates to other objective evidence. So Standard sent it out to an independent physician. And there's no argument that Dr. Woodward was not an independent physician. And they sent it to him for his comments. It was the second time they'd sent it to him and their fifth review of the claims submitted by the plaintiff. The independent orthopedic surgeon said clinically there is no support for a diagnosis of right cervical radiculopathy, meaning I don't see the evidence for this. And then Standard went back to Ms. Mobine and said. Am I correct in understanding no cervical radiculopathy doesn't mean no radiculopathy. It means no radiculopathy caused by a cervical impingement on the nerve. There is no objective evidence that whatever cervical problem she was having, if she was having a cervical problem, was causing her radiculopathy. Yes. I think I'm agreeing with you. Okay. Or to put it another way, it wasn't emanating from that particular part of her spine, the C6, C7? I hesitate a little bit because I'm not sure that the it, you know, that there was. Let me ask the question more clearly. Okay. I understood you to say that Standard sent it out saying, okay, we have this EMG. Here is the suspected problem area shown in the EMG. Dr. Woodward, what do you think? Dr. Woodward looked at the results of the EMG and the prior clinical observations and said I don't see any clinical support for reaching a conclusion that that is the cause of the radiculopathy. That's correct. Have I got it right? Yes. Okay. Yes, Your Honor. So this is the heart of the plaintiff's case that we were somehow hiding the ball or doing something different when all, in fact, Standard was doing was doing exactly what plaintiff's own physician suggested that it do and send it out to an independent physician, get the review, and act on its review. Now, there was some discussion here about a doctor said this and a doctor said that. The Court is probably aware, but I would like to emphasize that there were 14 or so treating physicians involved in this case, and their records were reviewed by everybody involved here in an effort to come to the right answer. But there are physicians who have said any number of things, and the best that you can ask an administrator to do is come up with an independent answer based on an independent review, and that's what Standard did. The point of all of this ERISA litigation is to be as simple and streamlined and as uncomplicated as possible. In this instance, Standard was required by the terms of the plan and the terms of the statute to give the plaintiff one review. They gave her five and did the best they could to come up with a fair answer. I don't think that... Are you questioning that she's disabled? Never mind what caused it. Your Honor, the company is treating her as disabled, and by you I assume you mean the company, not me personally. Yes. The company is treating her as disabled, but they're treating her as disabled from a cause for which they only pay for 18 months. Okay. And they've paid the 18 months, and they've said that's all we owe. Okay. So, no, they're not questioning her disability, just the cost. Unless there are further questions, I don't have anything to add. Thank you. Thank you, counsel. Thank you. Thank you. I want to make a couple points here regarding we were spending a lot of time on this radiculopathy, and I think that the record also reflects that she didn't have just a radiculopathy diagnosis. She had other conditions which would have exempted her from the plan's other limited conditions, including the cervical myelopathy and the herniated disc, which is documented by the MRI, the lumbar herniated disc. But isn't the last point the one that we have to focus on? We have to look at the terms of the disability policy. That's right. And standard acknowledges that this woman has health problems. That's right. They paid her 18 months' worth of benefits, ultimately, because of the good work that your firm did in getting them to keep looking at the file. But the question now is whether or not they're liable for payments until age 65, based upon the terms of the policy. That is the question, Your Honor. And the plan says that if you have a myelopathy, if you have a radiculopathy documented by EMG, and if you have a herniated disc with neurological abnormalities that are documented by an EMG and a CT or an MRI, you can get continued benefits. She had all of those things. As this Court, as the Ninth Circuit said recently in Montour v. Hartford, that the plan administrator's decision, you know, they abused their discretion in part because they did not explain why they rejected Social Security's findings. Well, Social Security found that Ms. Mobayan was disabled as a result of a herniated disc, a lumbar herniated disc and cervical myelopathy. Standard didn't explain why it was rejecting Social Security's findings and its reliance on its own retained expert that said she had this severe condition. And that condition is exempted under the plan's other limited conditions. I thought the thrust of your argument was the radioculopathy, radiculopathy. Are we now shifting to? No, Your Honor. I think we've made this argument. I mean, the focus has been on the radiculopathy because when Standard denied her claim, they said very little about her myelopathy diagnosis or her herniated disc diagnosis. They said you don't have radiculopathy, you don't have an EMG. But the thrust of your argument on appeal, I thought, was radiculopathy. And if I understand what Standard did, they said we need more information. They got it. They sent it out to this orthopedist. The orthopedist looked at it, gave him an opinion. And they have, under the terms of the policy and the ERISA statute, the discretion to make that determination. Right, Your Honor. But I don't believe that its reliance on this pure paper review conducted by Dr. Anthony Woodward really supports its position. I mean, they disagreed with their own doctor. The doctor said she doesn't have radiculopathy. And Standard said, okay, you do, but you don't have neurologic abnormalities. Well, Dr. Woodward is an orthopedist. And if Standard's decision hinged so greatly on the presence of a neurological abnormality, why not have her evaluated by a neurologist in person instead of relying on a pure paper review? At what point, I guess, in the reasonableness of the administrator's review do we say enough is enough? Your Honor, the doctors who found that Ms. Mobain was not disabled were Standard's doctors who did only pure paper reviews. There was no in-person examination by an independent doctor here. Her doctors supported her disability on the basis of radiculopathy. They said that she demonstrated the dermal loss of sensation, the weakness, the radicular pain. That was all documented. And once they had the EMG, Standard was obliged to continue paying her benefits because that's what they said was missing from her claim. So do you think that it was an abuse of discretion for Standard not to ask for an independent medical evaluation? I don't know that that's an abuse of discretion, but I think when the court is weighing the conflict that that goes in favor of giving more weight to this conflict because they relied on a pure paper review. That's what the court in Montour v. Hartford said. And I think that particularly in this case, when you have this discrepancy on were there neurological abnormalities, you should have her examined in person. Okay. Thank you, counsel. Thank you. Biome v. Standard Insurance is submitted. We'll hear Atlanta Cancer Care v. Amgen. What is this?
judges: Trager, Kleinfeld, Tallman